UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-60020-DIMITROULEAS/SNOW

UNITED STATES OF AMERICA

v.

**JOSE SANTEIRO,**

      **Defendant.**
_____/

## UNITED STATES' SENTENCING MEMORANDUM

      The United States of America, through undersigned counsel, respectfully submits this Sentencing Memorandum in advance of the sentencing for Dr. Jose Santeiro. This Sentencing Memorandum also briefly responds to the Defendant's Objections to the Sentencing Guidelines calculations [D.E. 726], as set forth by U.S. Probation in the Presentence Investigation Report [D.E. 719] and the Defendant's Sentencing Memorandum [D.E.737]. Given the Defendant's egregious, lengthy criminal conduct, providing the necessary medical authorization for a scheme that lasted for years, and billed approximately $111 million to private insurers, he deserves a substantial jail sentence. Two medical directors convicted of addiction treatment fraud cases in this district were sentenced to 135 months (Dr. Abovyan) and 100 months (Dr. Agresti) for similar schemes. Dr. Santeiro's sentence must be commensurate with these sentences.

      The evidence at trial showed that Dr. Santeiro provided a pretense of medical oversight to a scheme that took advantage of vulnerable patients suffering from addiction to steal millions of dollars from insurers. Dr. Santeiro did not just steal money, he ruined lives. He admitted patients for unnecessary detox, overmedicated patients, permitted patients to be discharged to lower levels of care and cycled back to detox again, and ordered excessive urinalyses ("UAs") that he did not use in treatment. Dr. Santeiro even allowed another doctor to use his ZenCharts login to treat

patients. Dr. Santeiro did not act like a doctor, but rather authorized treatment that was dangerous, unnecessary, or never provided, knowing it would be billed as legitimate. Dr. Santeiro did not profit as much as others, nor did he orchestrate this scheme, but without him and his medical license, the scheme could not have happened at all.

The key factor in fashioning an appropriate sentence for Dr. Santeiro as opposed to others in this case is that Dr. Santeiro's conduct was essential for the scheme to occur at all, and it did not just stop at Compass Detox and WAR. As the Government proved at trial, Dr. Santeiro's conduct extended to Florida Life Recovery & Rehabilitation, LLC ("Florida Life") and First Step Medical LLC d/b/a Future Now Detox ("Future Now"). And Dr. Santeiro used the same laboratory arrangement at Florida Life that he used at Compass and WAR, resulting in additional billing for fraudulent laboratory tests. Dr. Santeiro therefore caused even more financial loss, and committed fraud more pervasively, than did even Jonathan Markovich.

Given the egregiousness of Dr. Santeiro's criminal conduct, the patient harm it caused, the amount of money fraudulently billed to insurers in this scheme, and the fact that he did the same thing at other addiction treatment facilities, the Government recommends a substantial prison sentence in this case.

I.     **DR. SANTEIRO'S CONDUCT WAS EGREGIOUS.**

Dr. Santeiro was the only Medical Director for Compass Detox and WAR for approximately three and a half years. Compass Detox and WAR were owned by Jonathan Markovich and Richard Waserstein, both of whom have been convicted in this scheme. As the evidence at trial showed, Dr. Santeiro systematically authorized and ordered expensive and medically unnecessary urinalysis ("UAs") for Compass and WAR's patients, often multiple times per week. Such frequent one-size-fits-all testing that is done at the highest and most expensive

levels runs entirely counter to the standard of care in addiction medicine. Dr. Santeiro did not care, and authorized such testing anyway. In fact, he signed blanket orders attesting to the medical necessity of a comprehensive panel of tests, which was used to justify the "auto creation" of orders for expensive confirmatory UAs, often run for dozens of substances even if the patient tested negative on point-of-care tests and even if the substances were not known drugs of abuse.

Likewise, as Dr. Waller confirmed, Dr. Santeiro routinely recycled and readmitted patients to Compass for detox treatment that they did not need and which made their addictions *worse*, by hooking them on additional medications that exacerbated their symptoms and made them want to use drugs. Patients reported coming to Compass not because they needed detox, but because they were homeless or because they got kicked out of WAR—and Dr. Santeiro admitted them. Dr. Santeiro was the only doctor at WAR, and WAR and Florida Life were the engines of the patient recycling. When Dr. Santeiro saw the same patients at WAR and, often, Florida Life, he knew they had cycled back through Compass and that they were not getting better. And when they discharged to go back to Compass again, he knew detox was often unnecessary.

Overmedication, which was the norm at Compass, induced relapse. Dr. Santeiro created the initial *pro re nata* (PRN) list (i.e., the "as needed" list) of sedating medications, as well as benzodiazepine tapers. Dr. Santeiro prescribed the comfort drink at least 199 times. When Compass patients reported negative symptoms, those symptoms were wrongly classified as withdrawal symptoms and used—by Dr. Santeiro and others—to justify more medications. According to Dr. Waller, the medications caused those very symptoms. These patterns and facts were documented routinely in the patient files by nurses, techs, and other staff who were actually doing their jobs, but simply ignored by the <u>only</u> person employed by both Compass and WAR licensed to treat this population: Dr. Santeiro.

Dr. Santeiro allowed Dr. Lieberman to use his ZenCharts account, which was essentially a signed prescription pad. Dr. Santeiro gave a blank check to Dr. Lieberman in every regard, when in reality Dr. Santeiro was responsible for ensuring proper addiction treatment, including medication.

Dr. Santeiro was the linchpin of the fraud scheme. He ordered many of the services billed for millions of dollars to private insurance health care plans—billing so absurd that it reached hundreds of thousands of dollars, even over a million dollars, for some patients. This was a profit center, not a treatment center, and none of the fraudulent or other criminal conduct could have happened without Dr. Santeiro providing the medical license—and blanket authorization—allowing it. The kickbacks that Richard Waserstein, the Markoviches, and Christopher Garnto paid to patients did not matter if the patients could not be admitted and billed to insurance on the basis of a doctor's order. Garnto and J. Markovich would have had no laboratory profits to share without a physician prescribing expensive UAs. Even Dr. Lieberman's signature was not enough to make this happen. None of this could happen without Dr. Santeiro agreeing to go along with it. Dr. Santeiro did not agree just once or twice, but hundreds of times over the course of this nearly four-year conspiracy. He ruined hundreds of lives as a result.

## II. DR. SANTEIRO COMMITTED HEALTH CARE FRAUD AT FLORIDA LIFE AND FUTURE NOW.

As the jury heard at trial, while Dr. Santeiro was serving as the Medical Director at Compass Detox and WAR, he was also the Medical Director of at least two other substance abuse treatment centers, Florida Life and Future Now, where he participated in similar health care fraud schemes. The Government presented some of the evidence relating to these facilities at Dr. Santeiro's trial, but consistent with the Court's admonition, avoided making such evidence a feature of the trial. For instance, Christopher Garnto testified that Compass Detox and Florida

Life (which is an outpatient facility that does not offer detox) had a reciprocal patient referral relationship. *See* Tr. 3/7/2022 at 227:13-21. He testified that patients at Florida Life were prescribed benzodiazepines, which made it so that patients returning to Compass Detox presented as if they needed detox. *See id.* at 228:3-21. Dr. Lieberman also testified that patients coming to Compass Detox from Florida Life were overmedicated, typically with benzodiazepines. *See* Tr. 3/14/2022 at 188:21 – 189:8.

The Government's summary witness, Missy Parks, testified regarding the following trends she observed in samples of patient files from Florida Life and Future Now:

- There was substantial overlap between the patient populations at Compass Detox, WAR, Florida Life, and Future Now. Specifically, 129 Florida Life patients and 167 Future Now patients attended Compass Detox and/or WAR. *See* GX 1254; Tr. 3/16/2022 at 219:3-21. This trend is notable because as the Medical Director at all these facilities, Dr. Santeiro would be the only conspirator privy to their treatment at all four of these facilities.

- Like at Compass Detox and WAR, many of the UA tests performed at Florida Life and Future Now were not reviewed or were reviewed after the patient was discharged from the facility, demonstrating that the test results were not used in the patients' treatment. *See* GX 1252 at 1; GX 1253 at 2; Tr. 3/16/2022 at 220:20 – 221:7, 222:14-17.

Additional patient files from Florida Life and Future Now, which were admitted as evidence at trial and are attached as exhibits to this memorandum, further demonstrate that Dr. Santeiro engaged in a similar course of conduct at those facilities as he did at Compass Detox and WAR. For example:

- ***Excessive UA Testing Not Used in Treatment***

  o Patient J.M. received <u>ten</u> confirmatory urinalyses tests every two or three days during his 23-day enrollment at Florida Life, from November 27, 2017 to December 19, 2017. *See* Exhibit A. As the Government proved at trial, Dr. Santeiro began working at Florida Life in December 2017; therefore, he could not have ordered all of these tests. But he did sign off on a number of them. For three of these excessive UAs, Dr. Santeiro bulk-signed the results on November 2, <u>2019</u>, nearly two years later. *Id.* 1, 9, 17. This includes the confirmatory UA done upon J.M.'s discharge from Florida

Life, which showed that he was taking only prescribed medications. Yet J.M. was admitted to Compass Detox for detox the same day and reported to Dr. Lieberman that he had been using heroin for two and a half weeks. Only Dr. Santeiro had access the ten confirmatory UAs at Florida Life showing that this was not true. *See* Ex. A-1.

- Patient P.M. received 28 confirmatory UAs at Florida Life between September 20, 2018 and December 6, 2018. *See* Exhibit B. A UA test with a date of service of October 19, 2018 was the sixth of ten confirmatory UAs for this patient that month, and one of three in a seven-day period. *See id.* at 82-85. The confirmatory UA tested for 15-21 different substances, and Dr. Santeiro did not sign off on the results of this UA until October 25, 2018, by which time two more confirmatory UAs had been performed on October 20 and 24, 2018, both also testing for 15-21 substances, including testing for the amounts of substances for which the patients had tested *negative* at the point-of-care. *See id.* at 78-81.

- **Overmedication of Patients**

  - Dr. Santeiro prescribed Patients A.F. and J.R. dangerous combinations of medications at Florida. A.F. was prescribed Buprenorphine, Klonopin (a benzodiazepine), Vistaril (an antihistamine), and Baclofen (a muscle relaxant) together and J.R. was prescribed Buprenorphine, Klonopin, Depakote, Seroquel, Buspar, Vistaril, and Remeron together. *See* Exhibits C and D.

  - Patient K.N.'s Florida Life Biopsychosocial Assessment, dated 3/20/2019 and signed off by Dr. Santeiro, states as K.N.'s reason for seeking treatment "Benzo maintenance, couples room. The best I ever done and the happiest I felt was when I was in Benzo maintenance." *See* Exhibit F. During that stay, Dr. Santeiro prescribed K.N. a combination of sedating medications, including Klonopin, Suboxone, Gabapentin, Methocarbamol, Hydroxyzine Hcl, and Seroquel. *See* Exhibit G.

- **Patient Recycling**

  - Patient J.R.'s Biopsychosocial Assessment from Florida Life signed off by Dr. Santeiro lists "Compass Detox / Hotel" as J.R.'s "Current Living Situation." It also states that "Client reported he has attempted recovery 30 times." *See* Exhibit E.

  - A Florida Life Medical Progress Note for Patient R.C. signed by Dr. Santeiro on May 1, 2019, states as the reason for visit "patient was here 3 ½ weeks ago, he left, used for one day and ended up in detox. He is now here for tx." *See* Exhibit H.

- o Patient L.L.'s Florida Life Biopsychosocial Assessment, dated 7/6/2018 and signed off by Dr. Santeiro, states "The client reported that she has been homeless – 'I have been going to treatment to treatment, no house.'" *See* Exhibit I.  This is the same L.L. who was admitted to treatment at Compass Detox 22 times.

- ***Admission for Medically Unnecessary Detox***

  - o On January 31, 2019, Dr. Santeiro signed an Initial Psychiatric Evaluation for Patient M.P. at Future Now, certifying M.P.'s admission to detox was medically necessary.  However, the Initial Psychiatric Evaluation stated as the Chief Complaint "A friend referred us here" and as the History of Present Illness "patient and his girlfriend ended homeless after being evicted from another facility."  *See* Exhibit J.  M.P.'s Pre-Admission Screening from that stay at Future Now states "Client reports going in and out of detox over the past two weeks."

  - o On December 6, 2018, Dr. Santeiro signed an Initial Psychiatric Evaluation for Patient N.B. at Future Now, certifying that N.B.'s admission to detox was medically necessary.  The Chief Complaint listed on the evaluation is "we left another program" and the History of Present Illness is "patient left AMA because she wanted maintenance."  *See* Exhibit L.

  - o On December 6, 2018, Dr. Santeiro signed an Initial Psychiatric Evaluation for Patient J.G. at Future Now, certifying that J.G.'s admission to detox was medically necessary.  The Chief Complaint listed on the evaluation is "we left another program" and the History of Present Illness is "patient left with his girlfriend AMA, seeking maintenance treatment."  *See* Exhibit N.  J.G.'s Pre-Admission Screening from 12/3/2018 notes: "Client states that he recently left detox after nine days due to wanting to use.  Client states that after using he instantly regretted it."  The form states that the length of J.G.'s last "Run" was one day.  *See* Exhibit M.

As Ms. Parks testified at Dr. Santeiro's trial, for the time period from approximately July 2017 to September 2020, Florida Life billed approximately $18,675,573 to insurance companies of which approximately $3,967,825 was paid, and the laboratories to which Florida Life referred UA testing billed approximately $3,729,732 to insurance companies of which approximately $520,462 was paid.  *See* Tr. 3/16/2022 at 241:12-22.  In addition, Future Now billed approximately $27,180,751 to insurance companies, of which approximately $4,849,436 was paid.  *Id.*

### III. THE GOVERNMENT'S RECOMMENDED SENTENCING GUIDELINES, AND RESPONSES TO DEFENDANT'S OBJECTIONS TO THE PSI.

The Government recommends the following calculations under the United States Sentencing Guidelines. The Government also briefly responds to the Defendant's objections to the PSI.

**Base Offense Level (7):**  As the PSI correctly calculated (PSI ¶ 67), the Base Offense Level for the Defendant's top count of conviction, conspiracy to commit health care fraud and wire fraud, is +7. U.S.S.G. § 2B1.1(a)(1).

**Intended Loss (+22):**  The PSI correctly calculated the Intended Loss as a +22. (PSI ¶ 68.) Dr. Santeiro was the Medical Director of Compass Detox and WAR and, therefore, along with his co-conspirators, is responsible for the bills submitted on behalf of patients. He also signed off on all of the laboratory testing for these facilities so is responsible for the associated laboratory billing. In total, Compass Detox, WAR, and the associated laboratories billed approximately $111 million to private insurers, of which approximately $28 million was paid. At the Markoviches' sentencing, the Government proposed that a 25% discount on loss would more than account for any valid services that Compass and WAR may have provided. [*See* D.E. 759]. The Court disagreed, and applied an over 90% discount.[1] Thus, for Jonathan Markovich, the Court reduced loss to $3.5 million to $9.5 million (+18).[2] Dr. Santeiro's loss is <u>more than</u> this amount.

---

[1]  The Government disagrees with the Court's ruling, but agrees that a sentencing disparity would be created in this case if Dr. Santeiro were sentenced on the full $111 million billed, or even the $83 million as discounted by the Government for Jonathan Markovich's sentencing. Conversely, a sentencing disparity would also be created if Dr. Santeiro were sentenced based on a lesser amount of loss than J. Markovich.

[2]  The Government had already applied a discount in its Sentencing Memorandum filed in advance of the Markoviches' sentencing, and had recommended a loss amount of $83,469,528 for J. Markovich. [D.E. 579.] Therefore, applying the Court's 90% discount to this figure, the Court's loss figure for J. Markovich is <u>$8.3 million</u>. The Government submits that this is the <u>starting point</u>

The Government submits that the Court should add the total billed amount for Florida Life and Future Now and labs to this calculation, which would result in a total loss figure of $57.88 million (**+22**).[3]  *See* U.S.S.G. § 1B1.3(a)(2)-(3).  Even if the Court elects to discount the Florida Life and Future Now loss figures by 90% ($4.96 million), loss for Dr. Santeiro is still at minimum $13.26 million (**+20**).  There is no escaping the fact that Dr. Santeiro's conduct was more expansive, and resulted in greater loss, than any other defendant in this case.

**Special Skill / Abuse of Trust (+2):**  The Defendant was a doctor and the Medical Director of Compass, WAR, Florida Life, and Future Now.  His medical license made the fraud scheme possible, even if Jonathan Markovich and Richard Waserstein benefited the most from the fraud.  The patients depended on Dr. Santeiro to provide necessary medical care; instead, he authorized treatment they did not need and that hurt their recovery, grossly sedating medications, and blatantly excessive urine drug tests that he barely reviewed.  Dr. Santeiro must be given a +2 enhancement for a special skill/abuse of trust.  This is consistent with Dr. Lieberman's sentencing outcome and plea agreement.  The PSI correctly calculates this enhancement.  (PSI ¶ 70.)

**Vulnerable Victims (+2):**  The patients in this case were often young people with substance abuse problems in danger of overdosing and death.  They could not have been more vulnerable.  The scheme preyed on their vulnerability.  There were approximately 1,000 patients at Compass and WAR during the relevant time period.  The Court found for the Markoviches that there were vulnerable victims, but that there were not a large number of vulnerable victims.

---

for calculating loss for Dr. Santeiro, as all of these bills depended on Dr. Santeiro's medical license.  In this regard, the PSI is slightly inaccurate, because it calculates loss as $53 million.  This is because the PSI started from $3.5 million, rather than $8.3 million and therefore inaccurately reflected the Court's ruling.  This does not change the guidelines calculation, however.

[3]    This is the $8.3 million loss figure from J. Markovich's sentencing + $49,586,057 billed for Florida Life, Future Now, and labs.

Therefore, the Court applied a +2 for this enhancement. Here, Dr. Santeiro took advantage of not only the approximately 1,000 patients at Compass and WAR, but also the additional hundreds of patients at Florida Life and Future Now. If the Medical Director committing fraud and taking advantage of hundreds and hundreds of vulnerable patients at four different facilities does not qualify for a +4 enhancement for vulnerable victims, it is hard to imagine why this enhancement even exists. It was tailor-made for this specific situation, to deter and punish the widespread recycling and shuffling of vulnerable patients from fraudulent treatment center to fraudulent treatment center.

Nonetheless, because the single greatest number of victims comes from Compass/WAR, and not Future Now and Florida Life, the Government agrees that a sentencing disparity would be created if a +4 were applied to Dr. Santeiro and not the other Defendants, and therefore proposes a +2 enhancement, as the PSI calculated (¶ 69).[4]

**Restitution:** The Government recommends $11,460,223 in restitution; $2,122,500 of which would be joint and several with the co-defendants. $2,122,500 is the same amount of restitution that Jonathan Markovich was ordered to pay. The additional $9,337,723 is the amount paid by private insurers to Florida Life, Future Now, and associated labs.[5]

---

[4] The Government's position is that an enhancement for more than 10 victims also applies to the defendants in this case. However, the Court did not apply this to the Markoviches. While there are dozens of insurance plans that paid Compass, WAR, Florida Life, and Future Now, the number of plans is similar in each instance and therefore the number of insurance plans (unlike the total billing and number of patients) does not materially change when the full scope of Dr. Santeiro's conduct is evaluated. Thus, the Government submits that a sentencing disparity would exist if this enhancement were applied to Dr. Santeiro, even though it is applicable under the law to many of the defendants in this case.

[5] Even if discounted by 90%, which it should not be, the total restitution figure would be $3,056,272.30.

**Forfeiture:** The Government recommends $267,041 in forfeiture, Dr. Santeiro's salary from Compass/WAR.

Once these enhancements and loss amounts are figured into the Defendant's guidelines calculations, Dr. Santeiro's total offense level is **33**, with a sentencing range of **135-168 months**, the same guidelines as calculated by Probation.

Even if the Court applies the exact same loss numbers as J. Markovich and same enhancements that applied to the other doctor, Dr. Lieberman, the total offense level is 29, with a sentencing range of 87-108 months. The Government submits that such a calculation is legally incorrect for the reasons discussed above because it fails to fully account for the additional fraud that Dr. Santeiro was committing at Florida Life and Future Now; but that is the absolute floor for this Defendant for this scheme. In addition, this calculation puts Dr. Santeiro *below* the guidelines range for Daniel Markovich, which the Government submits vastly understates Dr. Santeiro's culpability.

D. Markovich was a young attorney just starting his career and followed his brother and brother-in-law, while Dr. Santeiro is a licensed psychiatrist who has practiced for decades, including in the Florida state prison system. D. Markovich did not work at WAR, while Dr. Santeiro's license made Compass and WAR possible. D. Markovich did not receive laboratory kickbacks, while Dr. Santeiro was the only doctor who signed off on labs. D. Markovich told J. Markovich to stop some of the wrongful conduct, while Dr. Santeiro allowed Dr. Lieberman to treat patients in his name. D. Markovich only served as CEO of Compass and only for a portion of the relevant time period, while Dr. Santeiro's fraudulent conduct covered the entire time period and expanded well beyond Compass and WAR to Florida Life and Future Now.

## IV. THE DEFENDANT'S SENTENCE MUST PROVIDE SPECIFIC AND GENERAL DETERRENCE.

As this Court is aware, it must consider deterrence—both specific deterrence of the Defendant, and general deterrence—to keep others from committing similar offenses. In determining how much weight to give this factor, the Court can consider the Defendant's "complete lack of remorse and unwillingness to accept responsibility." *United States v. Joseph*, 700 F. App'x 918, 923 (11th Cir. 2017). While Dr. Santeiro will no doubt strenuously argue that as a first-time offender he is unlikely to re-offend, his unwillingness to express remorse or to accept responsibility supports the notion that a substantial jail sentence is warranted. Indeed, throughout the trial, Defendant cast blame on others (chiefly Dr. Lieberman and Garnto). Even now, in his objections to the PSI and letters submitted alongside Defendant's sentencing memorandum, Defendant blames Dr. Lieberman for the treatment decisions at Compass (and somehow, WAR), and suggests the Defendant merely surrounded himself with the wrong people. Remarkably, while *agreeing* a fraud occurred (as his counsel submitted during opening statements), Dr. Santeiro continues to cling to the notion that hurting patients in the way he unquestionably did is simply not criminal if done under the guise of a medical license. Dr. Santeiro committed a crime when he authorized treatments that were medically unnecessary or essentially not rendered (like wasted UAs that were never reviewed) because he knew insurance was being billed and he knew the treatments were unnecessary. In short, he lied for money. And he did it all over South Florida. He committed a more prolific fraud than anyone else in this case.

Furthermore, Defendant has a medical license and a family. He had a long career, where he learned what his responsibilities were as a doctor. Even he agrees that he could have simply retired. Despite having these advantages and the ability to make a living lawfully, he still *chose* to do wrong. And he did so repeatedly. His crime was not something he did once in a misguided

fit of passion. Instead, he lied repeatedly, hundreds and even thousands of times, each time his signature was applied to sign off on a service that was not necessary and, in many cases, was actually harmful. He did this for years, for thousands of patients, across three counties (Miami-Dade, Broward, and Palm Beach) and to the tune of tens of millions of dollars. He simply did not care enough to do the right thing. He was not fooled. Instead, he chose to become a go-to doctor for fraudulent billing and sold his license in every corner of this district.

The Court should also sentence Dr. Santeiro in a manner that deters other addiction treatment fraud schemes, and, in particular, deters other doctors from legitimizing them. As the Court is aware from observing the evidence in this trial, South Florida is replete with treatment centers that trap patients in a cycle of addiction and bill as much as possible to their insurance plans. The term "Florida Shuffle" was discussed throughout the trial, and with good reason. What makes this kind of health care fraud different from many others is the vulnerability and helplessness of the patients. Lives that could be saved are instead ruined. The loss here is not simply economic and is not simply felt in South Florida; rather, it is felt by families and friends across the entire country whose loved ones, often young and suffering, are trapped by people like Dr. Santeiro and like his co-conspirators who want to make money and simply do not care if these people get better.

As the Court has seen, this scheme was orchestrated and driven by people who have everything—lawyers, doctors, professionals—but who just want more. Even if well-intentioned at the outset, which the Government readily admits that Dr. Santeiro and some others in this case may have been, he very quickly become willing to lie for money. This greed and indifference to human suffering drives these schemes. Without doctors willing to provide a medical license to

justify this type of fraud, like Dr. Santeiro, the ringleaders of schemes, like Jonathan Markovich, could not send a single false bill.

As the Eleventh Circuit has noted, post-*Booker*: "[E]conomic and fraud-based crimes" are "more rational, cool, and calculated than sudden crimes of passion or opportunity," and thus these crimes are "prime candidate[s] for general deterrence." *United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006) (citing Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the *Martin* court noted that the legislative history of Section 3553 showed that Congress viewed deterrence as "particularly important in the area of white-collar crime. … even where [the defendant] might themselves be unlikely to commit another offense." *Id.* (emphasis added) (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Court in *Martin* held that "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Martin*, 455 F.3d at 1240. General deterrence is "particularly important in the area of white-collar crime," because would-be perpetrators are watching. *See id.*

Furthermore, the Eleventh Circuit has made clear that general deterrence is especially important in white collar offenses where greed is the motive. In *United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014), the Court of Appeals rejected a probationary sentence for a white-collar defendant – even though the government had filed a 5K1.1 substantial assistance motion because: "general deterrence is an important factor in white collar cases, where the motivation is greed . . . we have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others." *Id.* at 1308. The Court went on to say that the low sentence imposed conveys "the message "that would-be white-collar criminals stand to lose little more than

a portion of their ill-gotten gains and practically none of their liberty," and accordingly do not constitute just punishment for [the] offenses or promote respect for the law. Second, the sentences do not provide for general deterrence because "[t]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." *Id.* at 1310-11. While Dr. Santeiro did not make nearly as much as Jonathan Markovich, he still made more than enough for what was, essentially, a no-show job involving massive fraud at Compass, WAR, and elsewhere.

More specifically, in a health care fraud case, the Eleventh Circuit delved deeper into the background of the § 3553(a) factors, in particular the general deterrence factor, and wrote:

> the Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense. We stated that because economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Our basis for this determination was that defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment.

*United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (internal quotations and brackets omitted). The guidance from *Hayes* and *Kuhlman* squarely applies to Dr. Santeiro; this was, at bottom, a crime of greed and convenience, even if he did not benefit as much as others.

IV. **THE SENTENCE THE GOVERNMENT RECOMMENDS WILL NOT CREATE ANY UNWARRANTED SENTENCING DISPARITIES.**

As made clear in 18 U.S.C. § 3553(a)(6), the need to avoid sentencing disparities between similarly situated defendants can weigh in favor of a variance. The sentences in this case are, to date:

- J. Markovich:  188 months (trial; no cooperation)

- D. Markovich:  97 months (trial; no cooperation)

- Garnto:  24 months (plea; 5K1.1 motion; testified twice; first to sign plea)

- Lieberman:  13 months (plea; testified once)

- Waserstein:  13 months (plea; 5K1.1. motion; did not testify)

- Bakhshi:  Home confinement (plea; 5K1.1 motion; cooperated immediately before preliminary hearing; testified once)

D. Santeiro was central to the scheme and necessary for the fraud. Everyone who received less than a 97-month sentence pled guilty, accepted full responsibility, notified the Government and the Court that they would be pleading guilty, agreed to cooperate with the Government, and signed appeal waivers to further avoid wasting court and prosecutorial resources. As the Eleventh Circuit has explained, "there can be no 'unwarranted' sentencing disparities among codefendants who are not similarly situated." *United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015). Accordingly, these co-conspirators, many of whom testified in this trial, are not similarly situated to Dr. Santeiro.  *See United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009) ("[T]here is no unwarranted disparity when a cooperating defendant pleads guilty and receives a lesser sentence than a defendant who proceeds to trial.").

Dr. Santeiro's conduct was less reprehensible than J. Markovich in that it did not involve paying patients or encouraging patients to be given alcohol or illicit drugs.  However, Dr. Santeiro's conduct was essential for the scheme to occur at all, and for the expense of kickbacks and flights to be worth it for ringleaders like Jonathan Markovich. Dr. Santeiro's conduct was more extensive than D. Markovich's who only worked at Compass, and not WAR and multiple other facilities.  And Dr. Santeiro hurt patients just as much as either of these Defendants did.  In fact, he hurt them more because he was the only person who could have rendered appropriate medical treatment.  Dr. Santeiro should therefore receive a guidelines sentence.

Another Medical Director similarly situated to Dr. Santeiro sentenced in an addiction treatment fraud case after being convicted at trial is Dr. Abovyan. *See United States v. Abovyan*, Case No. 18-CR-80122-MIDDLEBROOKS. Dr. Abovyan, the Medical Director of a facility involved in fraudulent urine drug testing (among other things), was sentenced to 135 months in February 2019, after a weeks-long trial in late 2018. [*Id.*, at D.E. 267]. And Dr. Santeiro's conduct in this case far exceeds Dr. Abovyan's in terms of intended loss.[6] Moreover, Dr. Abovyan did not work at several clinics committing the same type of fraud. Similarly, Dr. Agresti, a Medical Director of a sober home that only caused fraudulent UAs (not fraudulent detox, overmedication, or patient recycling in the way Dr. Santeiro did), received a 100-month sentence for a $105 million scheme. *See United States v. Agresti*, Case No. 18-CR-80124-RUIZ. Dr. Santeiro should receive a commensurate sentence. Indeed, his conduct demands it.

---

[6] In *Abovyan*, the Government sought to hold Dr. Abovyan responsible for a loss amount of approximately $11.3 million. [*Id.*, D.E. 259 (Response to Defendant's Sentencing Memorandum), at 9]. Dr. Santeiro's loss amount is at least that much, even discounted by 90% across all four treatment centers and labs. He should receive a commensurate sentence.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully recommends that Dr. Santeiro's objections to the PSI be overruled, and that he be given a substantial jail sentence.

Dated:  July 1, 2022                                  Respectfully submitted,

                                                      JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

LORINDA I. LARYEA, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

By:   /s/ *Jamie de Boer*
JAMES V. HAYES
Senior Litigation Counsel
FL Special Bar No. A5501717
JAMIE DE BOER
Trial Attorney
FL Special Bar No. A5502601
ANDREA SAVDIE
Trial Attorney
FL Special Bar No. A5502799
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Phone: (202) 262-6453
Email: James.Hayes@usdoj.gov
Email: Jamie.deBoer@usdoj.gov
Email: Andrea.Savdie@usdoj.gov

## **CERTIFICATE OF SERVICE**

 I hereby certify that on July 1, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                      */s/ Jamie de Boer*